E-FILED
Monday, 26 October, 2026 10:13:50 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

DYTANYA ROBINSON,

Plaintiff,

v.

CITY OF ROCK ISLAND, ILLINOIS & TIMOTHY MCCLOUD,

Defendants.

Case No. 4:25-cv-04030-SLD-RLH

ORDER

Plaintiff Dytanya Robinson sues her employer, the City of Rock Island ("the City"), and Police Chief Timothy McCloud for discrimination throughout the course of her employment with the Rock Island Police Department ("the Department"). Robinson, a black woman, primarily contends that she was discriminatorily passed over for a promotion, but she also claims that she suffered discrimination in the form of verbal reprimands, negative performance reviews, and denied training opportunities. Alternatively, Robinson contends that she suffered these actions in retaliation for her complaints of discrimination. Now before the Court is Defendants' motion for summary judgment, ECF No. 23, arguing that Robinson's claims fail as a matter of law because she has not produced any evidence to support her claims that the complained-of actions were motivated by consideration of Robinson's race and/or sex. The Court agrees and therefore GRANTS Defendants' motion.

## BACKGROUND[1]

### I. Factual Background

#### a. Robinson's Employment[2]

Robinson has worked with the Department since March 30, 1998. The Department is run by a police chief, who selects one deputy chief. Below the deputy chief are a number of lieutenants, then sergeants, then patrol officers. During her time with the Department, Robinson served under seven police chiefs, including Jeffrey Ven Huizen from December 12, 2012, to October 31, 2021; Richard Landi from November 2021 to late April 2024; and McCloud from late April 2024 to the present. Robinson served as a patrol officer until 2011, when she was promoted to sergeant. On February 3, 2025, she received a promotion to lieutenant. Robinson is heavily involved in the Rock Island community and often represents the Department in community projects.

When Robinson was first hired, Sergeant Poulos was her supervisor. Poulos engaged in behavior that Robinson describes as harassment, such as constantly nitpicking her work, showing up at her house when she was not on duty, and getting unjustifiably upset with her. Poulos once

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The facts related here are, unless otherwise noted, taken from Defendants' statement of undisputed material facts, Mot. Summ. J. 5–23; Robinson's response thereto and statement of additional material facts, Resp. Mot. Summ. J. 2–22, ECF No. 29; Defendants' reply to Robinson's additional material facts, Reply Supp. Mot. Summ. J. 1–17, ECF No. 32; and from the exhibits to the filings. Where the parties disagree about the facts, the Court views the evidence in the light most favorable to Robinson and draws all reasonable inferences in her favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[2] In their briefing, the parties also discuss how, in 2021, Robinson contracted COVID and was in a coma, intubated in a hospital, from July to August of that year. She could not return to work until November. The Department would not let her return to work until she was cleared by her personal physician, the city's nurse practitioner, a pulmonologist, and a pulmonary therapist. Even after returning to work, she was restricted to desk duty until she was fully released from pulmonary therapy. She was released to full duty on December 28, 2021.

Despite the briefing on the matter, the Court does not find it necessary to discuss these facts further since Robinson is not pursuing a discrete claim of discrimination based on her treatment during the return-to-work period, Resp. Mot. Summ. J. 12, describes the facts as "immaterial," *id.*, and does not reference them in her argument, *see generally id.*

denied Robinson's request for leave to attend her son's surgery, saying that if Robinson went, he could not guarantee that she would have a job in the Department when she came back. At some point when Van Huizen was police chief, Lieutenant Daniel Knittle called Robinson into his office and yelled at her about her involvement with a community board. During his tirade, Knittle asked Robinson: "[D]o you think people respect you because you're a black woman? No, they only respect you because I allow you to be a police officer." Robinson Dep. 88:7–10, Mot. Summ. J. Ex. 1, ECF No. 23-1. Robinson immediately reported this conversation to Van Huizen.

**b. School of Police Staff and Command Course**

Police officers in the Department have the opportunity to attend training courses, such as the School of Police Staff and Command Course ("the Course"). When the Moline Police Department hosted the Course from August 14 to December 11, 2023, the Department was allowed to send three officers. Robinson, then a sergeant, requested approval to attend but was denied because the Department prioritized sending lieutenants to the Course. The three officers eventually chosen to attend were Lieutenant Morris, Lieutenant Pattison, and Sergeant Meiresonne. Robinson asked why Meiresonne was selected to attend, and Landi told her that he was sending younger officers. Defendants now state that Landi chose Meiresonne because he was essentially running the Criminal Investigations Division, which did not have a lieutenant at the time. Morris, Pattison, and Meiresonne attended the course during their regular working hours.

The Course was held again from March 11 to August 18, 2024. Robinson attended the Course online during that administration, but she paid for it herself and was not able to use her working hours to attend. When Landi learned that she was taking the course online, he told her

to submit a reimbursement request, and Robinson was eventually reimbursed for the cost of the course. Robinson was not allowed to use comp time to receive payment for the hours spent on course work.

**c. Performance Reviews**

On June 14, 2023, Robinson received a performance review from her supervisor, Lieutenant Muehler. It noted that Robinson failed to achieve one specific goal: timely coordinating and overseeing the 2023 winter training schedule. It also included a negative assessment of Robinson's communication skills, based on complaints from Robinson's fellow officers.

On May 24, 2024, Robinson received a performance review from Lieutenant Pattison. Pattison rated Robinson seven or eight out of nine for communication. After Robinson complained to him about the rating, Pattison changed her score.

**d. 2023 Verbal Reprimand and Discrimination Complaint**

In November 2023, a white, male officer placed a firearm into evidence but failed to put proper information about the firearm in an email that he sent to Robinson. Robinson then forwarded the email without correcting the error. On November 27, 2023, McCloud issued a verbal reprimand, the lowest level of formal discipline in the Department, to Robinson for failing to make proper notifications. Robinson gave the white, male officer a verbal reprimand for the same thing.

While McCloud was at Robinson's desk to give the verbal reprimand, Robinson raised concerns about discriminatory treatment she experienced while working at the Department. Both Robinson and McCloud testified about the event in their depositions, but they disagree about exactly what happened. According to Robinson, when she mentioned being discriminated

against, McCloud responded, "discrimination is hard to prove" and left to return to his office. Robinson Dep. 236:11–18. After composing herself, Robinson followed McCloud to his office and laid out her complaints. She mentioned others in the Department knowing about a disciplinary investigation that was supposed to be confidential, *see infra* pt. I(f); her conversation with Knittle in which he said: "[D]o you think people respect you because you're a black woman? No, they only respect you because I allow you to be a police officer," Robinson Dep. 88:7–10; the incident when Poulos did not allow her to see her son when he was sick; and how these experiences led her to believe that the disciplinary investigation was opened to harm her chances of being promoted. The conversation ended when McCloud got up and walked out of his office. Robinson admits that she never said why she was being discriminated against.

McCloud reports a different version of events. He testified that the word "discrimination" did not come up until they were in his office. When Robinson said that she was being discriminated against, McCloud responded that he had a duty to do something about that and asked her to tell him how she was being discriminated against. She only stared at him. After Robinson said the verbal reprimand may have been to keep her from being promoted, McCloud said that he understood disliking discipline, so he was not upset. Robinson immediately apologized. At the end of the conversation, McCloud said he would leave his door open any time to talk. McCloud then briefed Landi and Morris on the conversation, informing them that Robinson had said that she felt like she was being discriminated against but would not say how. McCloud testified that he "certainly did not say anything to the effect of discrimination is hard to prove." McCloud Dep. 162:13–18, Mot. Summ. J. Ex. 2, ECF No. 23-2. The parties agree that no further steps were taken to address Robinson's claim of discrimination.

**e. Verbal Reprimand for Rule 5 Violation**

The Department has a written policy known as "Rule 5" that provides in part: "Members shall avoid regular or continuous associations or dealings with persons whom they know[] are . . . suspected felons, . . . except as necessary in the performance of official duties, or where unavoidable because of family relationships of members." Restricted Activities 1, McCloud Dep. Ex. 16, ECF No. 23-6 at 11–17.

In April 2023, McCloud and Morris were told that the Moline Police Department was investigating Robinson's involvement with Maurice Davis, a prior felon who was involved in a domestic violence incident and later committed suicide.[3] Since the investigation involved a police officer, the Illinois State Police Public Integrity Task Force ("ISP") ran the investigation to determine whether Robinson gave Davis the gun he used to commit suicide. The state's attorney declined to charge Robinson with any criminal offense.

The Department was not involved in any criminal investigation of Robinson, but McCloud and Morris wanted to investigate whether Robinson had violated Rule 5. Morris checked to see whether Davis was a felon and learned that he had previously been convicted of murder.[4] Landi, who was still police chief at the time, did not want to investigate the possible

[3] Robinson objects to the consideration of this fact. Resp. Mot. Summ. J. 4–5. She argues that what was told to McCloud and Morris is hearsay "being offered for its dual truths: (1) that Moline was investigating Robinson, and (2) that she was associating with a felon." *Id.* Robinson's objection is overruled because the Court does not take this statement as showing either that Moline was investigating Robinson or that Robinson was associating with a felon. Instead, it is considered for the impression it had on McCloud and Morris, which is relevant to the reasons they might have undertaken the subsequent investigation of Robinson. Moreover, the basic nature of the underlying investigation is not reasonably in dispute since Robinson admits that the Illinois State Police investigated her relationship with Davis. Resp. Mot. Summ. J. 5.

[4] Robinson objects to this statement, arguing that it would violate Federal Rule of Evidence 1004 to rely on Morris's testimony instead of Davis's actual criminal record. Resp. Mot. Summ. J. 6. Rule 1002 generally requires an original writing, recording or photograph. However, Rule 1004 enumerates several exceptions to this rule, including when "the writing, recording, or photograph is not closely related to a controlling issue." Fed. R. Evid. 1004(d). This exception applies when "no good purpose is served by production of the original." Fed. R. Evid. 1004 advisory committee's note on 1972 proposed rules. In this case, there is no good reason to require production of originals since Davis's status as a felon is not meaningfully in dispute. *See generally* Resp. Mot. Summ. J.

Rule 5 violation. After Morris pressed, Landi agreed to try to get the reports from the ISP and Moline Police Department, but he never received them. As a result, the Department never conducted a further investigation of Robinson while Landi was police chief.

After Landi retired, McCloud obtained the reports and began an internal investigation regarding a possible Rule 5 violation. Morris ran the investigation, during which he reviewed the reports and interviewed Robinson. According to Morris, Robinson admitted that she knew already in 2022 that Davis was a felon and nevertheless saw him at least five times thereafter. Robinson claims that she did not learn that Davis was a felon until shortly before his death in March 2023. On June 6, 2024, Morris gave Robinson a verbal reprimand for violating Rule 5.

**f. Lieutenant Promotion Lists**

The Department has a written promotional policy governing promotions of sergeants to lieutenants. Under this policy, promotional decisions are made by the police chief in conjunction with the Fire and Police Commission. To decide who receives a promotion, the Commissioners and police chief evaluate the top five individuals on an eligibility list. Placement on the eligibility list is determined based on the combination of seniority and scores on a written test and oral interview. The Commissioners and police chief also review each candidate's performance evaluations, discipline history, and awards when making promotional decisions. Eligibility lists are generally effective for two years, at which time new assessments are conducted and a new list is created.

The 2020 list was effective from July 21, 2020, to July 21, 2022. Robinson placed fourth on the list. While the list was effective, Ven Huizen promoted the top three candidates from the list. In November 2021, after Landi became police chief, the lieutenant of the Tactical Operations Division retired. Landi then restructured the Department to eliminate the Tactical

Operations Division, which converted the now-vacant lieutenant position into a sergeant position. Robinson was not promoted to lieutenant while the 2020 list was effective.

Robinson placed first on the lieutenant eligibility list that ran from July 22, 2022, to July 22, 2024. During that period, McCloud became police chief and promoted Morris to deputy chief. This opened the lieutenant position previously held by Morris. No officer was promoted to fill that position while the 2022 eligibility list was effective.

Robinson placed fourth on the lieutenant eligibility list that went into effect on July 23, 2024. Robinson placed second in the written test. McCloud ranked Robinson first in the oral interview. During the oral interview process, since Commissioners had heard rumors about Robinson's involvement with Davis, McCloud told them about the Department's investigation into Robinson's potential Rule 5 violation.

After the 2024 list became effective, the Department re-established the lieutenant position that had been converted to a sergeant position in 2022. Additionally, Lieutenant Smith retired in late July 2024, and Lieutenant Pattison retired in January 2025. On November 19, 2024, McCloud announced that four sergeants would be promoted to lieutenant, effective February 3, 2025. Robinson was promoted along with Sergeants Connelly, Meiresonne, and Kuhlman. She was promoted to the position of Third Shift Commander.

## II. Procedural History

On August 22, 2024, Robinson submitted a Charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. After receiving a right to sue letter, she filed a complaint in this Court, ECF No. 1, which she later amended, ECF No. 8. In her amended complaint, Robinson brings 13 counts, alleging (under a variety of legal theories) that Defendants discriminated against her on the basis of race, sex, and

the combination of race and sex throughout her employment at the Department, including "when it denied her a promotion to lieutenant, promoted her to lieutenant with the least seniority, denied her training opportunities, investigated and disciplined her more harshly, and gave her less favorable performance reviews." *See generally* Am. Compl. She also alleges that Defendants retaliated against her for complaining about discrimination in the Department. *Id.* at 11–12, 19.

Defendants then filed a motion to dismiss, ECF No. 10, which the Court granted in part, *see* July 29, 2025 Order, ECF No. 12. The Court held that Robinson's complaint "relies solely upon discrete acts," meaning each act must have occurred within the relevant statute of limitations to be actionable. *Id.* at 11. It then detailed the relevant statutes of limitations, the most expansive being the four-year statute of limitations for her claims brought under 42 U.S.C. § 1981. *Id.* at 12. As a result, it dismissed all claims rooted in acts occurring prior to January 18, 2021. *Id.* at 13.

After conducting discovery, Defendants filed the present motion for summary judgment. They argue that they are entitled to judgment as a matter of law because Robinson has not identified any evidence showing that the complained-of actions were discriminatory or retaliatory. Mot. Summ. J. 4–5. Robinson filed a response opposing summary judgment, ECF No. 29, and Defendants submitted a reply in support of their initial motion, ECF No. 32. The parties both filed unopposed motions to submit evidence under seal. *See* Defs. Mot. Seal, ECF No. 27; Robinson Mot. Seal, ECF No. 30.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment is to determine "whether there is the need for a trial,"

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), in other words, whether any genuine factual issues exist for a finder of fact to decide. While the moving party ultimately carries the burden of persuasion as to the motion, *see* Fed. R. Civ. P. 56(a), "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the nonmoving party bears the burden of production under Rule 56 to designate specific facts showing that there is a genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quotation marks omitted). To prove that a fact is or cannot be genuinely disputed, a party must "cit[e] to particular parts of materials in the record" or "show[] . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Genuinely disputed facts can only defeat summary judgment if they are material, that is, if given resolution in the non-moving party's favor, "a reasonable jury could find for the party opposing the motion." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quotation marks omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

At summary judgment, the court must "construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). But it need not turn a blind eye to obvious factual conclusions. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

## II. Analysis

Robinson seeks recovery under five statutes: (1) the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 to 5/10-105, (2) the Illinois Civil Rights Act of 2003 ("ICRA"),

740 ILCS 23/1 to 23/5, (3) 42 U.S.C. § 1981, (4) 42 U.S.C. § 1983, and (5) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. *See generally* Am. Compl. As the parties note, Mot. Summ. J. 24–25; Resp. Mot. Summ. J. 22–23, each of these statutes is evaluated using the same standard. *See Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) ("[The plaintiff] brought [his] claim under three statutes—Title VII, 42 U.S.C. § 1981, and the IHRA—but the legal standard is the same under all three."); *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) ("The legal standard for analyzing racial discrimination claims under Title VII and § 1983 is the same."); *Zaderaka v. Ill. Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (analyzing employment discrimination claims using "the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII of the Civil Rights Act of 1964"); *Williams v. Dart*, 967 F.3d 625, 637 n.1 (7th Cir. 2020) ("The Illinois Civil Rights Act . . . ha[s] been held only to provide a state forum for federal rights under Title VI and Title VII . . . ."). The Court therefore considers the statutes together and refers to them collectively as "Title VII."

**a. Employment Discrimination**

The bulk of Robinson's complaint alleges that Defendants discriminated against her on the basis of race, sex, or a combination of race and sex. *See generally* Am. Compl. "Title VII forbids any workplace discrimination 'with respect to [an individual's] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin.'" *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 727 (7th Cir. 2001) (quoting 42 U.S.C. § 2000e-2(a)(1)). There is a single legal standard in employment-discrimination cases: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016) (quotation marks omitted). This test is composed of three essential elements: that (1) a plaintiff's proscribed factor (2) caused (3) an adverse employment action.[5]

There is no dispute that Robinson is a black woman and now claims discrimination on those grounds. As a result, to assess Robinson's discrimination claims, the Court must ask only two questions: first, whether the complained-of treatment constitutes an adverse employment action; and second, whether the adverse action was caused by Robinson's race, sex, or combination of race and sex, *see* July 29, 2025 Order 6–8 (finding that Robinson's intersectional race-and-sex-based discrimination claim is not duplicative of her race- and sex-based claims).

To establish the element of adverse action, a plaintiff must show that she suffered "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). "While the harm need not be 'material' or 'significant,'" to qualify as an adverse action, it "must affect the 'terms or conditions of employment.'" *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 470 (7th Cir. 2025) (quoting *Muldrow*, 601 U.S. at 353 n.1, 355).

---

[5] Plaintiffs may also prove discrimination claims by traversing the burden-shifting framework created by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* test, plaintiffs first establish a *prima facie* case of discrimination, the precise nature of which depends on the form of discrimination the plaintiffs complain of. *Compare, e.g.*, *Cunningham v. Austin*, 125 F.4th 783, 788 (7th Cir. 2025) (stating that, in a failure to promote case, "the plaintiff must show that she was (1) a member of a protected class, (2) qualified for the position, (3) rejected for the position, and that (4) the position was given to a person outside the protected class who was similarly or less qualified than the plaintiff."), *with Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002) (stating under *McDonnell Douglas* the plaintiff must show: "1) he belongs to a protected class; 2) his performance met his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) similarly situated others not in his protected class received more favorable treatment"). If an employee meets each element, then the employer must articulate a nondiscriminatory reason for the adverse action before the burden shifts back to the employee to show that the employer's explanation is pretextual. *Cunningham*, 125 F.4th at 788.

While the parties may refer to the *McDonnell Douglas* framework, and the Court may adopt it as an organizational tool, when it is not helpful to the disposition of a plaintiff's claims, it need not be satisfied nor even addressed. *See Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025) ("*McDonnell Douglas* may have limited value as a heuristic when a plaintiff has not taken that approach to presenting his case."). In this case, Robinson does not attempt to utilize *McDonnell Douglas*, *see* Resp. Mot. Summ. J. 23, and the Court does not find it helpful to do so.

With respect to causation, a plaintiff must present evidence that "a statutorily proscribed factor caused" the adverse action. *Pratt v. Wis. Aluminum Foundry*, 183 F.4th 541, 551 (7th Cir. 2026) (quotation marks omitted). This is assessed by determining "whether the totality of the evidence shows discrimination." *Id.* (quotation marks omitted). A plaintiff need not prove that discrimination was the only reason for the employer's decision—a Title VII plaintiff can bring "mixed-motive" claims wherein "discrimination was a motivating or a substantial factor in the employer's action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 171 (2009) (quotation marks omitted); *Igasaki v. Ill. Dep't of Fin. & Pro. Reg.*, 988 F.3d 948, 960 (7th Cir. 2021). Evidence indicative of causation includes: "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Pratt*, 183 F.4th at 559 (quotation marks omitted). A central inquiry is whether an employer's asserted reason for the adverse action is pretextual, that is, whether the employer lied about the reason for its action.[6] *See Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025) ("Pretext is a lie, specifically a phony reason for some action . . . ." (alteration and quotation marks omitted)).

Robinson argues that the evidence she presents of her experience in the Department, considered holistically, establishes both of these elements. *See* Resp. Mot. Summ. J. 25–26. She contends that "the Court should not look at each of these actions in a vacuum. Instead, the facts should be analyzed together to determine whether a jury could return a verdict for the non-moving party." *Id.*

[6] The language of "pretext" took on prominence under *McDonnell Douglas*, but the Seventh Circuit has since affirmed that pretext may serve as evidence of discrimination under the more expansive causation inquiry of *Ortiz*. *See Napier*, 137 F.4th at 892; *Pratt*, 183 F.4th at 559–60; *Abayomi v. Collins*, 182 F.4th 587, 593–94 (7th Cir. 2026).

Because Robinson brings a discrimination claim, not a hostile work environment claim, it is inappropriate to consider the cumulative effect of individual acts as a single adverse action. *See* July 29, 2025 Order 11 (finding that Robinson's complaint "relies solely upon discrete acts" when bringing its discrimination claims); *see also Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 663 (7th Cir. 2011) (declining to consider "the cumulative effect of individual acts" because "[the plaintiff] raised a discrimination claim, not a hostile work environment one"). The various discrete acts may interact with each other and combine to create an inference of discrimination, *cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (allowing plaintiffs to use prior, otherwise time-bard acts "as background evidence in support of a timely claim"), but each action must be evaluated as a distinct adverse employment action.

Robinson points to several distinct alleged discriminatory acts: two negative performance reviews, two verbal reprimands, the denial of her request to attend the Course, the subsequent denial of her request to use comp time to complete her coursework when she attended online, the denial of a promotion to lieutenant with respect to both the 2020 and 2022 eligibility lists, and an underpromotion stemming from her low placement on the 2024 eligibility list.[7] *See* Resp. Mot. Summ. J. 24–27. The Court will address each in turn.

**i. Verbal Reprimands and Performance Reviews**

Robinson complains of two performance reviews that included critical assessments and two instances in which she was verbally reprimanded. A performance review by Muehler in 2023 noted that Robinson failed timely coordinate and oversee the 2023 winter training schedule

[7] Defendants suggest there are nine distinct actions at issue: (1) the COVID fitness requirements; (2) the 2022 denial of promotion to lieutenant; (3) the denial of Robinson's request to attend the Course; (4) the 2023 performance review: (5) the 2023 verbal reprimand; (6) the denial of Robinson's request to use comp time for time spent on the Course in 2024; (7) the 2024 verbal reprimand; (8) the 2024 denial of promotion to lieutenant; and (9) Robinson's low placement on the 2024 lieutenant eligibility list. Mot. Summ. J. 2–4. Robinson is not pursuing a discrete claim of discrimination based on her COVID treatment, Resp. Mot. Summ. J. 12, but the remaining categories correspond to Robinson's claims.

and included a negative assessment of Robinson's communication skills. Robinson Dep. 223:6–227:23. In 2024, a performance review from Pattison rated Robinson seven or eight out of nine for communication. *Id.* at 261:9–263:8. Robinson's first verbal reprimand came in November 2023, when she forwarded an email that did not include proper information about a firearm that was placed into evidence storage. *Id.* at 232:21–234:13. The second came in June 2024 after a Department investigation concluded that Robinson's involvement with Davis violated the associations provision of Rule 5. *Id.* at 266:4–16. To prove her discrimination claims, Robinson must show that the negative performance reviews and verbal reprimands were both adverse actions and were caused by Robinson's race, sex, or a combination of the two.

The Seventh Circuit has long held that verbal discipline and negative performance reviews are not adverse actions since they do not themselves alter the terms or conditions of employment. *See Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of [the plaintiff's] employment are not adverse employment actions."); *Grube*, 257 F.3d at 729 ("[U]nfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions."); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) ("[A] letter of reprimand is not an adverse employment action *unless the letter is accompanied by some other action, such as job loss or demotion*."); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) ("As for the negative performance evaluations, it is well established that these alone do not constitute an adverse employment action.").

In response to circuit courts holding that the impact on job consequences had to be "significant" or "substantial" to qualify as an adverse action, the Supreme Court admonished that plaintiffs "do[] not have to show . . . that the harm incurred was significant. Or serious, or

substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow*, 601 U.S. at 355 (quotation marks omitted). The plaintiff must show only that she suffered "*some harm* respecting an identifiable term or condition of employment." *Id.* (emphasis added). Critically, however, *Muldrow*'s holding that there is no heightened "materiality" requirement for adverse action did not displace the preceding case law that reprimands—whether verbal or written—and negative performance reviews are not adverse actions because they are not inherently accompanied by any changes in the terms and conditions of employment. The Seventh Circuit in *Arnold* considered the effect of *Muldrow* and concluded that, while it eliminated any requirement that the change in terms or conditions of employment be "material" or "significant," *Muldrow* did not alter the necessity that under Title VII, an alleged discriminatory act is only actionable if it affects the terms or conditions of employment. *Arnold*, 142 F.4th at 470; *see id.* at 471 ("[O]nly discipline causing some harm respecting an identifiable term or condition of employment is actionable on its own." (quotation marks omitted)). The *Arnold* court then identified several indicia of altered terms of employment: changes in an employee's position, duties, compensation, benefits, vacation time, or working hours. *Id.* at 471. As such, the reprimands and negative performance reviews do not constitute adverse actions unless they were accompanied by "some other action, such as job loss or demotion." *Krause*, 246 F.3d at 1000 (emphasis omitted).

In this case, Robinson claims that the reprimands and performance reviews negatively impacted the conditions of her employment because the Commissioners and police chief considered them when creating the 2024 eligibility list for lieutenant promotions. Resp. Mot. Summ. J. 26. Consequently, they caused her to receive a promotion into the position of Third

Shift Commander, which is less desirable than the position she would have attained in the absence of the reprimands and performance reviews. *Id.*

However, Robinson does not present evidence that any of the disciplinary actions or performance evaluations affected the promotional decision. She argues only that the Commissioners had access to her disciplinary record and performance evaluations, not that they actually relied on them when making promotional decisions. *Id.* (arguing that the Commission "would have seen" Robinson's performance evaluations and discipline history). In fact, Robinson testified in her deposition that she did not know why the Commissioners scored her as they did. *See* Robinson Dep. 296:11–18. This evidence does not distinguish her case from the wealth of caselaw showing that negative performance reviews and reprimands are not adverse actions. Presumably, an employer will have *access to* such information when making promotional decisions in nearly every situation. Holding that such evidence is sufficient to show that reprimands and performance evaluations caused a change to the terms or conditions of employment would cut against long-standing Seventh Circuit case law.

Even if the reprimands and negative performance reviews were adverse actions, Robinson presents no evidence that they were caused by any protected characteristic.[8] To demonstrate that poor communication was not the reason for the negative performance reviews, Robinson must show that her supervisors did not believe that she deserved the marks she received. *See Galvan v. Indiana*, 117 F.4th 935, 940 (7th Cir. 2024) ("[I]t is not enough to merely show that in the past, [the plaintiff's] former supervisor evaluated his performance positively. [The plaintiff] would need to demonstrate that the employer did not genuinely believe

[8] As for the performance reviews and discipline for improper evidence storage, Robinson does not even *argue* that these actions were motivated by consideration of her race and/or sex. *See generally* Resp. Mot. Summ. J.

its later evaluations that perceived the performance as inadequate."). In this case, there is no reason to doubt that the negative comments on the performance reviews were the genuine beliefs of Robinson's supervisors. Both performance reviews gave her a less than perfect score on communication. Robinson Dep. 227:20–21 (stating that Muehler rated Robinson seven for communication); *Id.* at 263:13–16 (noting that Pattison initially gave her a communication score of "seven or eight" out of nine). McCloud has testified that communication within the Department is one of Robinson's "more glaring weaknesses." McCloud Dep. 86:20–87:24. This consistency across supervisors suggests that the assessment of Robinson's communication skills was genuine, not pretext for discrimination. *See Paterakos v. City of Chicago*, 147 F.4th 787, 798 (7th Cir. 2025) (finding lack of pretext for performance-related suspensions because, *inter alia*, negative performance evaluations "were consistent with [prior] assessments"). There is also no reason to doubt that the verbal reprimand was caused by Robinson's involvement in the improper storage of evidence. Robinson took responsibility for the mistake, Robinson Dep. 240:13–17, and personally disciplined a white man in the exact same way for the exact same action, *id.* at 232:21–233:17.

Similarly, on the record now before the Court, no reasonable jury could conclude that Robinson's reprimand for the Rule 5 violation was discriminatory. The only evidence Robinson points to is the Department's history of enforcing Rule 5. *See* Resp. Mot. Summ. J. 29. Robinson notes that only two individuals—both black women—have ever been disciplined for violating the associations provision of Rule 5. *Id.* at 17; McCloud Dep. 149:11–151:19.

Discrimination can be shown if employers selectively enforce their rules. *Abayomi v. Collins*, 182 F.4th 587, 594–95 (7th Cir. 2026). But in order to show selective enforcement, a plaintiff must show that the rule was not enforced against another employee who was "similarly

situated." *Id.* at 595. "Though not a magic formula, a plaintiff must typically show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (quotation marks omitted). Robinson does not identify any other employee who engaged in similar conduct but was not disciplined for a Rule 5 violation. *See generally* Resp. Mot. Summ. J. She therefore cannot prove causation by demonstrating selective enforcement.

Additionally, "statistics can be a useful tool that can . . . provide powerful evidence of discriminatory intent if race [or another protected characteristic] can be isolated from other confounding variables." *Conley v. United States*, 5 F.4th 781, 796 (7th Cir. 2021). However, data showing how enforcement of a policy affects people of different races is often of limited value "because it lacks critical context" surrounding the enforcement. *Vega v. Chi. Parks Dist.*, 954 F.3d 996, 1011 (7th Cir. 2020) (finding that statistical data could not show a "widespread custom" of discrimination against Hispanic employes for purposes of municipal liability under 42 U.S.C. § 1983). Robinson's data—that the only two individuals punished for a violation of the associations provision of Rule 5 were black women—is not enough to show causation. This data lacks critical context surrounding the enforcement, such as how many employees may have violated the rule**.** In the absence of more complete contextual information, a sample size of only two employees is far too small to show causation.

As such, no reasonable jury could find that Robinson's critical performance reviews or the verbal reprimands constitute actionable discrimination.

**ii. Denial of Training**

Next, Robinson claims she was discriminatorily denied permission to attend the School of Police Staff and Command Course and, when she did attend at a later date, could not use work hours to take the Course and was discriminatorily prevented from using comp time for the hours spent on course work. Resp. Mot. Summ. J. 26–27. In January 2023, Robinson applied to attend the Course at the Moline Police Department that fall. Robinson Dep. 282:3–7; McCloud Dep. 92:14–17. The Department was only allowed to send three officers. Landi Dep. 92:24–94:5. Landi and McCloud disapproved the request, stating that they were was sending lieutenants first. Robinson Dep. 282:8–11; McCloud Dep. 94:2–19. Robinson was a sergeant at the time. Eventually, Lieutenants Morris and Pattison attended, along with Sergeant Meiresonne. McCloud Dep. 97:3–8. This denied training opportunity does constitute an adverse action. *See Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024) (holding that deferred training "entails 'some harm'" because it "can mean deferred promotions or deferred raises"); *see also Arnold*, 142 F.4th at 470–71 ("In *Thomas*, we . . . held that, under the *Muldrow* 'some harm' standard, delaying training, denying vacation times, transferring shifts, and considering family circumstances in a biased way are all adverse actions.").[9]

However, Robinson has failed to meet her burden to produce evidence sufficient to show that the denial was because of her race and/or sex. McCloud testified that a third lieutenant who was supposed to attend the Course had already purchased airline tickets for a vacation, so he could not attend. McCloud Dep. 94:24–95:11. Relying on Landi's deposition testimony,

---

[9] This conclusion seems inconsistent with the case law on reprimands and performance reviews, *see supra* pt. II(a)(i), since discipline and performance reviews also "[could] mean deferred promotions or deferred raises," *Thomas*, 120 F.4th at 1337. However, given the clear language of *Thomas*, and the long-standing rule that discipline and negative performance reviews are not adverse actions without evidence that they impacted a discernable condition of employment, it is not the Court's place to disturb either rule. Nor would it be necessary to do so since the Court's conclusion that the verbal reprimands and negative performance reviews were not caused by any protected characteristic is independently sufficient to support summary judgment for those claims.

Defendants contend that Meiresonne was chosen to attend the Course because he was essentially running the Criminal Investigations Division. Mot. Summ. J. 9, 35 (citing Landi Dep. 93:5–95:16). Robinson disputes that Landi's deposition testimony supports that fact, pointing to the portion in which Landi testified that he did not "remember the specifics" of why Meiresonne was chosen to attend and that he believed there may have been a scheduling issue that meant Meiresonne was the next available person to attend. Resp. Mot. Summ. J. 3 (citing Landi Dep. 94:18–95:16). Robinson also points to her testimony that Landi told her he was selecting younger officers to attend the Course. *Id.* (citing Robinson Dep. 283:5–20). To the extent that Robinson was intending to raise an argument that the reason given for denying her the opportunity to attend the Course at this time was pretextual, the argument is undeveloped as Robinson does not mention it in the argument section of her response or cite any cases about shifting explanations being evidence of pretext. Accordingly, the argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[A]rguments that are unsupported by pertinent authority[] are waived . . . . "). "[I]t is not th[e] court's responsibility to research and construct the parties' arguments." *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010) (first alteration in original). Robinson appears to argue instead that the evidence shows that Defendants only gave one reason for the denial—that the Department was sending younger officers. Resp. Mot. Summ. J. 3, 26–27. But this cannot support Robinson's claim since she only seeks liability for discrimination based on sex, race, and a combination of the two. With respect to that claim, Robinson identifies no evidence indicative of discrimination. There is no evidence of discriminatory statements by Landi of McCloud, any other hostile behavior directed towards people in the protected group, or "other bits and pieces from which an inference

of discriminatory intent might be drawn." *Pratt*, 183 F.4th at 559 (quotation marks omitted). As such, her claim for discriminatory denial of training cannot succeed.

Robinson also cannot sustain an independent claim based on the denial of comp time. The comp time would have covered out-of-class time spent on assignments when she took the Course online in 2024. Her claim fails because, first, there is no evidence that she was treated differently than any other officer. In fact, Robinson admits that she does not know whether any other officers received comp time for completing their assignments. Robinson Dep. 320:1–14. Second, she does not even attempt to present evidence that she was denied comp time because of her race and/or sex. *See generally* Resp. Mot. Summ. J. As a result, there is no evidence suggesting that Robinson was discriminated against either when she was denied comp time to complete assignments for the Course or when she was not approved to attend the Course when it was offered at the Moline Police Department in 2023.

**iii. Failure to Promote**

**1. 2022**

Robinson placed fourth on the 2020 lieutenant eligibility list. Robinson Dep. 175:7–10. During its pendency, the individuals ranked one through three on that list were promoted. *Id.* at 175:11–15; Eligibility Lists 8,[10] McCloud Dep. Ex. 11, ECF No. 23-6 at 5–10. There would have been a fourth lieutenant opening during Landi's tenure, but he restructured the Department to convert that vacated lieutenant position into a sergeant position. Landi Dep. 107:22–108:8. Robinson was not promoted to lieutenant in 2022.

Denial of a promotion qualifies as an adverse action. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 899–900 (7th Cir. 2003). However, it is only actionable if there was an open

[10] Since Exhibit 11 from McCloud's deposition is not separately paginated, when referring to this exhibit, the Court refers to the page numbers generated by CM/ECF for ease of reference.

position for the applicant to be promoted into.[11] *See Jones v. City of Springfield*, 554 F.3d 669, 673 (7th Cir. 2009) ("The lack of an opening is always a legitimate reason for refusing to hire or promote."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) (describing "the absence of a vacancy in the job sought" as one of the "two most common legitimate reasons on which an employer might rely to reject a job applicant").

Defendants argue that Robinson cannot prevail because there was no open position for which she was rejected. Mot. Summ. J. 32. They maintain that "Landi restructured and eliminated the Tactical Operations Division because the department could not staff it, and this changed a lieutenant position back to a sergeant position. There were no lieutenant openings when he was chief." *Id.* Robinson responds that there *was* a lieutenant position that opened under Landi in 2022. Resp. Mot. Summ. J. 24. She emphasizes the fact that, though the Department reorganized in 2022, the lieutenant position has since been recreated. *Id.* The inference, of course, is that the Department reorganized, not for any legitimate staffing reasons, but to avoid promoting Robinson.

Defendants ask the Court to recognize a rule that "'[i]f . . . no employee is promoted during the relevant time period, a failure-to-promote claim must fail because the claimant cannot argue that he was treated differently than anyone else.'" Mot. Summ. J. 32 (quoting *Jones*, 554 F.3d at 673). Such a rule would preclude Robinson's recovery since the Department did not promote any sergeant to fill the vacated lieutenant position. But *Jones* does not stand for such a sweeping proposition. Immediately following the quote Defendants cite, the *Jones* court says,

[11] The Seventh Circuit has articulated a distinct *prima facie* case in the failure-to-promote context: "To establish a *prima facie* case of failure to promote, [the plaintiff] must show that (1) she is a member of a protected class; (2) she applied for, and was qualified for an open position; (3) she was rejected; and (4) the employer filled the position with a person not in her protected class, or the position remained open." *Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1005–06 (7th Cir. 2000). While this articulation of the *prima facie* case shows that a plaintiff cannot prevail on a failure-to-promote claim if there was no opening, following the precise formula outlined in *Howard* is unnecessary in light of *Ortiz*.

"[i]n other words, Title VII does not mandate the creation of new positions." *Jones*, 554 F.3d at 673. This shows that the quote Defendants take from *Jones* addresses instances in which there is no opening for anyone to fill, not all cases in which an opening goes unfilled.[12] Moreover, *Jones* continues: "In rare cases, the decision not to create a position can be discriminatory, but there must be evidence showing that the decision was racially motivated." *Id.* at 673. It follows by analogy that, in addition to the decision not to create an opening, the decision to *close* an opening by restructuring instead of hiring can be discriminatory, but there must be evidence that the decision to do so was driven by consideration of the plaintiff's protected characteristic.

The question, then, is whether Robinson has evidence showing that the decision to eliminate the lieutenant position rather than promote her to lieutenant was motivate by her race, sex, or a combination of the two. Robinson points to two facts supporting her claim that the decision to eliminate the lieutenant position by reorganizing was motivated by discrimination: (1) the lieutenant position was later recreated, and (2) the decision arose in the context of the negative review scores from her supervisors in 2023 and 2024, verbal reprimands for improper evidence storage and a violation of Rule 5, and the subsequent failure to promote in 2024. Resp. Mot. Summ. J. 24–25. She argues that these facts permit the conclusion that the reorganization was discriminatory. *Id.*

This evidence is not sufficient to allow a reasonable jury to find that the decision to reorganize the Department to eliminate the lieutenant position was motivated by race. The negative reviews, disciplinary actions, and later failures to promote do little to illuminate the reasons for the restructuring since they impacted different aspects of Robinson's employment

[12] This reading also comports with *Howard*'s recitation of the *prima facie* case, *see supra* n.8, in which a plaintiff can prevail if an employer fills an opening with someone not in the plaintiff's protected class or if "the position remained open." *Howard*, 234 F.3d at 1006.

and involved different decision makers. *See Gage v. Metro. Water Reclamation Dist. of Greater Chi.*, 365 F. Supp. 2d 919, 938 (N.D. Ill. 2005) (reasoning that evidence is not indicative of animus when it "deal[s] with a wide variety of decision makers making very different employment decisions"). Moreover, as discussed above, there is no evidence that the performance reviews or disciplinary actions were discriminatory, so they cannot support a finding of animus here. On the record before the Court, the re-creation of the lieutenant position could have been done for any number of legitimate reasons. Perhaps the needs of the Department changed, or perhaps Chief Landi, who eliminated the position, had different priorities than Chief McCloud—during whose tenure it was re-established—or other municipal decision makers at the time. *See* Resp. Mot. Summ. J. 11. The record does not discredit any of these possibilities, nor does it affirmatively show that the restructuring was discriminatory. In short, there is no evidence that the lieutenant position was eliminated for discriminatory purposes.

**2. 2024**

Robinson placed first on the lieutenant eligibility list that ran from July 22, 2022, to July 22, 2024. Robinson Dep. 218:19–219:1. Before the list expired, McCloud promoted Morris to deputy chief, but no officer was promoted to fill the lieutenant position that Morris had vacated. *Id.* at 219:2–20. Robinson argues that the decision not to promote her before the 2022 eligibility list expired was discriminatory. Resp. Mot. Summ. J. 24–25. Defendants maintain that there was no opening for lieutenant before the 2022 eligibility list expired, and even if there was, the decision not to fill it was not discriminatory since McCloud "did not fill any open positions until 2025 due to manpower reasons." Reply 20.

The evidence suggests that there was a lieutenant opening in 2024 before the 2022 eligibility list expired. McCloud promoted Morris to deputy chief "a couple of weeks before the [2022] eligibility list expired." Morris Dep. 90:6–17, Mot. Summ. J. Ex. 4, ECF No. 23-4. Since Morris was a lieutenant before his promotion, when he was promoted to deputy chief there was a lieutenant opening.

Robinson's discrimination claim thus hinges on whether the Department's proffered justification for not promoting her in 2024—manpower reasons—is legitimate. McCloud testified in his deposition that when the lieutenant position was opened, there was a staffing shortage. McCloud Dep. 166:20–167:4. His operational priority throughout the shortage was to keep patrol going, which could be done even down one or two lieutenants. *Id.* at 167:5–20; *see also* Morris Dep. 91:1–5 (stating that there is a "minimum amount of officers that are required to patrol on any given shift on any given day, and [the Department] can't go below that"). McCloud stated that only once he learned that Pattison was planning to retire in January 2025—well after the 2022 promotional list expired—did he anticipate a critical shortage in upper command, meaning the Department would not be able to function properly without filling the vacant lieutenant positions. McCloud Dep. 67:17–19, 166:20–167:20. At that point, his efforts to replenish upper command included re-creating the lieutenant position that had been restructured into a sergeant position in 2022. *Id.* at 67:24–68:6.

Robinson contends that the "staffing shortages" explanation must be pretextual because Landi achieved significant staffing gains during his tenure as police chief, so there were no longer staffing concerns by the time McCloud became chief. Resp. Mot. Summ. J. 27–28. She further reasons that McCloud promoted four sergeants to lieutenant in February 2025, which could not have happened if staffing concerns prevented the promotion of even one sergeant less

than a year earlier. *Id.* Finally, she maintains that the proffered explanation also appears pretextual because it reflects a pattern of continuously being denied for a promotion when she was next up in priority. *Id.*

Despite Robinson's contentions, the Department's stated reason for not hiring a lieutenant in 2024 is plausible, and Robinson has not presented any evidence suggesting that the given explanation is illegitimate. Robinson acknowledges that when McCloud became chief, the Department had at least four unfilled positions. Resp. Mot. Summ. J. 27–28.[13] This supports McCloud's testimony that the Department was still recovering from the staffing shortage it experienced during the COVID pandemic. *See* McCloud Dep. 73:20–74:10. Moreover, the Department's decision to promote four officers less than a year later does not undermine McCloud's explanation. The later promotions are consistent with McCloud's claim that shortages in upper command were not critical until Pattison's retirement, *Id.* at 67:17–19, 166:20–167:20. And since the Department regularly declines to fill positions for staffing reasons, *id.* at 40:24–42:1; Landi Dep. 112:6–8, the fact that it declined to do so in this instance is not suspicious. Whether it is wise to leave the lieutenant position open or not, "the court is not a super personnel department that second-guesses employers' business judgments." *Galvan*, 117 F.4th at 939 (quotation marks omitted). Since Robinson has not presented evidence of discrimination, her claim of discriminatory failure to promote cannot prevail.[14]

---

[13] There is some dispute around how many open positions there were in the Department when McCloud was named interim chief. Robinson cites to Landi's deposition, in which he states that, on his best recollection, the Department had 77 officers when he retired, meaning the Department was four officers down. Landi Dep. 89:14–20. However, McCloud states that there were only 72 officers, which would mean the Department was down nine officers. McCloud Decl. ¶ 3, Reply Ex. 1, ECF No. 32-1. The exact number of officers is immaterial since, in either case, the Department's staffing situation is consistent with Defendants' proffered justification for not immediately filling the vacated lieutenant position in 2024.

[14] The Department promotional policy states: "In the event that a vacancy or vacancies existed for a period of time during the twenty-four (24) months, the eligibility list shall be extended for a period of time equal to the time that the vacancy or vacancies existed during the twenty-four (24) months period." Promotional Policy 3, McCloud Dep. Ex. 3, ECF No. 29-2 at 14–17. The fact that the list expired even though there was an open lieutenant position

#### iv. Underpromotion/Placement on 2024 Lieutenant Eligibility List

Robinson placed fourth on the lieutenant eligibility list that went into effect on July 23, 2024. Robinson Dep. 294:5–8. After this list became effective, two lieutenants retired and the Department re-established the lieutenant position that had been converted to a sergeant position in 2022. McCloud Dep. 67:6–69:12. This was on top of the lieutenant vacancy left by Morris's promotion to deputy chief. *Id.* As a result, four sergeants, including Robinson, were promoted to lieutenant on February 3, 2025. *Id.*; Robinson Dep. 297:6–13. Robinson was promoted to the position of Watch Commander on Third Shift. Robinson Dep. 297:14–16. She suggests that this underpromotion was discriminatory, noting that her rank on the 2024 eligibility list meant that "three white male lieutenants had greater seniority." Resp. Mot. Summ. J. 24.

The Court need not decide whether being appointed to an undesirable lieutenant position constitutes an adverse action because, in any event, there is no evidence that the promotional decision was caused by consideration of Robinson's race and/or sex. The final rankings on the lieutenant eligibility list are composed of three components: a written test comprising 40% of the total score, an oral interview by the police chief and the Police and Fire Commission that makes up 25% of the total score, and in which the police chief's evaluation provides an additional 25% of the score, and seniority, which makes up the remaining 10% of the final score. Promotional Process 2, McCloud Dep. Ex. 3, ECF No. 23-6 at 1–4. Robinson admits that "no one asked [her] any questions that she believed were discriminatory in the oral interview," Resp. Mot. Summ. J. 10, and she testified that she did not know why the Commissioners scored her oral interview as they did. Robinson Dep. 296:11–18. This alone cuts against the merits of Robinson's claim.

---

may have violated this policy. However, Robinson does not argue that the failure to follow Department policy was discriminatory, nor does she bring any standalone counts of procedural impropriety. Any such argument is therefore waived.

*See Wilson v. AIM Specialty Health*, 176 F.4th 977, 986 (7th Cir. 2026) ("Where an employer relies on ranking employees to support its employment decisions, it is not our job to second-guess that ranking . . . .").

Moreover, Robinson's claim falls apart on a closer look at the rankings. If Robinson is correct that McCloud—and others in the Department—discriminated against her, then one would expect her ranking to be weighed down by McCloud's evaluation of her qualifications. Or, perhaps, if individuals in the Department scored the written exam (a fact that the record does not clarify), then her score on that test would depress her final ranking. This is not what happened. McCloud ranked Robinson first in the oral interview. Eligibility Lists 5. She was ranked second in the written exam. *Id.* Robinson ultimately ranked lower than Connelly, Kuhlman, and Meiresonne because the *Commissioners* gave her lower scores on the oral interview. *Id.* But Robinson says nothing about the Commissioners in her response. *See generally* Resp. Mot. Summ. J. There is scant evidence in the record showing *anything* about them, much less evidence suggesting they were motivated by Robinson's race and/or sex to rank her lower than her colleagues. Even if Robinson is right that the Commissioners gave her a lower score because they reviewed her negative performance reviews and recent disciplinary action against her, *see id.* at 26, this is also not evidence of discrimination since there is no evidence that the lower performance reviews or verbal reprimands were themselves discriminatory, *see* supra pt. II(a)(i).

Further, if Robinson were correct that the rankings decision was discriminatory, then McCloud's decision to reinstate the eliminated lieutenant position (in consultation with the City Manager and City Attorney), McCloud Dep. 67:24–68:10, would be strange indeed. Because of that decision, though she ranked fourth, Robinson was still promoted while the 2024 eligibility

list was effective. Such a decision is inconsistent with Robinson's theory that she was being blackballed from a lieutenant promotion.

On the record before the Court, there is simply no evidence about what actually influenced the Commission's decision, and Robinson points to no evidence that any of the decision makers were motivated by consideration of her race, sex, or the two in combination. Absent such evidence, she cannot succeed.

In sum, Robinson has clearly outlined what happened to her—she was passed over for a promotion several times, and when she was finally promoted, she received a lesser posting than several other individuals with less seniority; during that same period, she received negative performance reviews and multiple verbal reprimands. But that is not enough. To prevail on an employment discrimination claim, Robinson must show not only *what* happened but *why* it happened. On this crucial point, Robinson is silent. She identifies no evidence in the record suggesting that any of the actions she complains about were caused by her race, her sex, or her status as a black woman. Having failed to shoulder this burden of production, her discrimination claim must be dismissed.[15]

---

[15] Though Robinson does not cite them in support of any of her discrete claims, it is worth briefly discussing two pieces of evidence that facially appear indicative of race or sex discrimination in the Department.

First, at some point when Van Huizen was police chief, Knittle asked Robinson during a tirade: "[D]o you think people respect you because you're a black woman? No, they only respect you because I allow you to be a police officer." Robinson Dep. 88:7–10. This does not support her discrimination claims, since Knittle was not involved in any of the actions that Robinson sues about and in fact retired from the Department in 2019, before the events of this case. *See* Rock Island Police Pension Fund Board of Trustees, Minutes 3 (April 24, 2019), https://rigov.org/AgendaCenter/ViewFile/Minutes/_04242019-363 (noting that Knittle retired from the Department on February 13, 2019); *accord* Robinson Dep. 86:12–87:10 (stating that Knittle retired somewhere around five or ten years prior to Robinson's deposition in April 2026). Moreover, the record does not show that Knittle's statement was reflective of a broader attitude towards Robinson's race and/or sex in the Department. *See* Robinson Dep. 91:11–15, 93:1–95:1 (stating that Knittle did not make any other racist statements to Robinson and that nobody else made indirect comments about Robinson's race that offended her).

Second, Landi testified in his Deposition that racial minorities and women faced a "different set of challenges" than white and/or male officers and could consequently have a more difficult time in the Department. *See* Landi Dep. 72:10–80:6. Landi's general characterization of the Department, too, cannot show that any of the adverse actions Robinson suffered were discriminatory since Landi stated that many of the challenges for minorities have eased since the 1990s, and other challenges—such as difficulty balancing a law enforcement career and motherhood,

**b. Retaliation**

Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3. "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Defendants are entitled to judgment as a matter of law because Robinson does not present evidence that she engaged in protected activity or that any adverse action was caused by her complaint.

**i. Protected Activity**

Robinson roots her retaliation claim in her informal complaint of discrimination to McCloud on November 27, 2023. Resp. Mot. Summ. J. 29. She argues that, after her complaint, McCloud retaliated against her by initiating an investigation into her association with Davis and eventually issuing a verbal reprimand for violating Rule 5. *Id.* at 30. Defendants argue that Robinson's informal complaint was not protected activity because the only discrimination she complained of was (a) performed by individuals who no longer worked with the Department or (b) disconnected from any protected characteristic. Mot. Summ. J. 40–41. Robinson does not respond to the substance of this argument.[16] *See* Resp. Mot. Summ. J. 29–30.

---

or struggles black officers faced in the community—are not suggestive of discrimination by the Department or its officers in discipline, training, or promotional decisions.

[16] Robinson suggests that Defendants have waived this argument because they admitted in their answer that she engaged in protected activity. Resp. Mot. Summ. J. 29. However, Defendants did not admit that Robinson engaged in protected activity; they only admitted "that [Robinson] complained to defendant McCloud about what she perceived to be discrimination at the time she was being reprimanded." Am. Ans. 10–11, ECF No. 15. They specifically denied "that [Robinson] told defendant McCloud any specific information regarding her perceived

"Protected activity is some step in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quotation marks omitted). While "an informal complaint may constitute protected activity for purposes of retaliation claims," *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009), "[m]erely complaining in general terms of harassment or discrimination, without specifying a connection to a protected class or providing facts to create such an inference, is insufficient," *McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022); *accord Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class."); *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) ("A complaint of discrimination is a protected activity under Title VII only if the discrimination is based on a protected characteristic like race.").

In this case, Robinson did not engage in protected activity because her complaint of discrimination did not indicate that the discrimination occurred because of a protected characteristic. When Robinson told McCloud on November 27, 2023, that she thought she was being discriminated against, *see* Robinson Dep. 234:21–240:2; McCloud Dep. 159:1–162:18, she did not identify the basis of the alleged discrimination. *See* Robinson Dep. 241:17–242:4 (testifying that she did not say why she thought she was being discriminated against); McCloud

discrimination." *Id.* Defendants do not now advance any argument contrary to their admission. They argue now that Robinson did not complain of discrimination *that was connected to any protected trait*, and that much of the nebulous "discrimination" that she did complain of could not amount to opposing discrimination because the alleged offenders were no longer employed with the Department. This is consistent with an admission that Robinson complained "about what she perceived to be discrimination." *Id.*

Dep. 161:4–9 (stating that when McCloud asked Robinson to tell him how she was being discriminated against, "she would only stare at [him]").

The circumstances of the conversation do not show that the substance of Robinson's complaint implicated race- and/or sex-based discrimination. In her deposition, Robinson repeatedly said that the conversation was ultimately aimed at combatting gossip and rumors floating through the office—especially surrounding Robinson's relationship with Davis—and ensuring that McCloud did not pre-judge her on the basis of that gossip. *See, e.g.*, Robinson Dep. 238:16–23, 241:20–242:4, 250:8–12. Robinson did discuss her encounter with Knittle, but there is no evidence showing that she specifically addressed his comment about her race. Robinson initially described the conversation as "Knittle saying that, you know, [she] was only a police officer because he allowed [her] to." *Id.* at 237:18–22. When asked directly in her deposition, Robinson's could not say that she told McCloud specifically about Knittle's comment that people don't respect her because she is a black woman. *Id.* at 245:8–23. Further, Robinson's mention of the encounter with Knittle was in the context of a number of other grievances—such as people in the office gossiping about the Davis investigation and Poulos refusing to let her attend her son's surgery—that have no facial connection to race or sex, suggesting the complaint was not focused on those protected characteristics.

The facts here are similar to those of *McHale*, where the Seventh Circuit held that complaints about sick leave restrictions and mistreatment during a promotional process did not implicate disability discrimination and, therefore, did not qualify as protected activity. *McHale*, 41 F.4th at 872. While sick leave restrictions can have some connection to disability—as Robinson's encounter with Knittle had some connection with race—the "substance of th[e] complaints" was not rooted in a protected class. *Id.* This case is also similar to *Tomanovich*,

where the court held that an informal complaint about what the plaintiff later termed "sexual harassment" was not protected activity because plaintiff only complained about "issues of harassment" and did not indicate that the alleged harassment was based upon his sex. *Tomanovich*, 457 F.3d at 664. Like the plaintiff there, Robinson fails to point to evidence that, in complaining to McCloud, she indicated that the alleged discrimination was based on her race and/or sex. On the whole, Robinson did not complain that any discrimination she faced was on the basis of a protected characteristic, nor did the substance of her complaint address facts sufficient to create such an inference.

**ii. Causation**

The causation inquiry ultimately comes down to one question: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the materially adverse action?" *Lesiv v. Ill. Cent. RR Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quotation marks omitted). To establish causation, Robinson must present evidence that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. SW Med. Ctr. v. Nasser*, 570 U.S. 338, 360 (2013).

Robinson contends that "[i]nstead of investigating Robinson's concerns, one of McCloud's first actions as interim Police Chief was to get a copy of the Moline Police's investigation involving Robinson." Resp. Mot. Summ. J. 30. This argument—that immediately after becoming chief in April 2024, McCloud launched an investigation into a potential Rule 5 violation—sounds in suspicious timing, which can support an inference of causation, though it rarely does so standing alone. *See Igasaki v. Ill. Dep't of Fin. & Pro. Reg.*, 988 F.3d 948, 959 (7th Cir. 2021).

In this case, no reasonable fact finder could conclude that McCloud's decision to investigate Robinson for a Rule 5 violation was caused by her complaint of discrimination. According to McCloud and Morris's deposition testimony, they wanted to investigate Robinson when they first learned about her involvement with Davis. McCloud Dep. 140:15–141:17; Morris Dep. 103:24–104:10, 105:18–23, 108:7–22. They did not act immediately because they wanted to wait until any criminal investigation was completed. Morris Dep. 103:24–104:10, 105:18–23. They eventually requested that Landi initiate an investigation, but the investigation did not get on its feet because Landi did not get records of the criminal investigation from the Moline Police Department. *Id.* at 109:3–114:24. However, McCloud made repeated attempts to obtain the records beginning in June of 2023. McCloud Dep. 145:6–147:9. He was not able to obtain the records until after he became police chief, at which point he directed Morris to investigate Robinson's relationship with Davis. *Id.* at 139:24–140:7, 141:18–23; Morris Dep. 115:1–6. Robinson has presented no evidence suggesting that McCloud and Morris's deposition testimony is inaccurate.

The record before the Court establishes that McCloud had pushed for an investigation for months before Robinson's informal complaint. The investigation did not get off its feet until later because McCloud did not have the authority to seriously investigate Robinson until he was chief. Even if McCloud had not sought to investigate Robinson before he became chief, the timing of the investigation would not support an inference of discrimination. McCloud did not become interim police chief—and begin the investigation of Robinson—until April of 2024, five months after Robinson's complaint on November 27, 2023. McCloud Dep. 16:23–17:6, 137:13–139:7. Five months is generally too long, standing alone, to support an inference of causation. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) ("Even intervals shorter than

four months are unlikely, standing alone, to establish the causation element of a retaliation claim.”). Since Robinson identifies no additional evidence to support her specious argument about suspicious timing, she cannot prove causation.

In sum, Robinson has not presented evidence sufficient for a reasonably jury to find either protected activity or causation. As a result, her retaliation claim cannot prevail.

**CONCLUSION**

Accordingly, Defendants the City of Rock Island and Timothy McCloud’s motion for summary judgment, ECF No. 23, is GRANTED. Since the Court did not rely on the exhibits the parties sought to seal, the motions to seal, ECF Nos. 27, 30, are MOOT. The Clerk is DIRECTED to enter judgment and close the case.

Entered this 26th day of October, 2026.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE